OPINION
{¶ 1} Defendant-appellant, Franklin J. Holdbrook, appeals his conviction and sentence in the Butler County Court of Common Pleas on one count of complicity to felonious assault in violation of R.C. 2923.03(A)(2) and 2903.11(A)(2), and two firearm specifications in violation of R.C. 2941.145 and2941.146.
 {¶ 2} On March 31, 2005, at approximately 3:30 p.m., Officers Ken Mynhier and Ed Sensel of the Middletown Police Department were dispatched to investigate a disturbance in the 800 block of 10th Avenue in the city of Middletown in Butler County, Ohio. Just prior to turning onto 10th Avenue, the officers heard shots being fired. Officer Mynhier heard at least six shots from a "higher-pitched smaller caliber weapon followed by one or two [shots from a] lower-pitched larger caliber weapon." Officer Mynhier immediately reported to the police dispatcher that shots were being fired. By the time Officers Mynhier and Sensel turned onto 10th Avenue, the shooting had stopped.
 {¶ 3} The first thing Officer Mynhier saw when he turned onto 10th Avenue was a green Pontiac Firebird in the middle of the street, with two black males inside. Officer Mynhier then saw another black male walking towards the green Pontiac Firebird, pointing a handgun at the vehicle. Officer Mynhier recognized the black male with the handgun as Robert Ramos, a.k.a. "Snooter." When Snooter saw the officers approaching, he immediately ran between two houses on the 800 block of 10th Avenue.
 {¶ 4} As Officers Mynhier and Sensel exited their patrol car to chase Snooter, "several older gentlemen" near a vehicle on the north side of 10th Avenue yelled to the officers, "dude, dude, there is a shooting that just happened," and "it's the green Firebird."
 {¶ 5} Officers Mynhier and Sensel ran between the houses searching for Snooter, but soon realized that he was already out of sight. Officer Mynhier looked back at the intersection of 10th Avenue and Lincoln Street and saw a patrol car coming down Lincoln Street towards 10th Avenue. He then saw the green Pontiac Firebird drive to the intersection of 10th Avenue and Lincoln Street, and turn right onto Lincoln Street. Officer Mynhier immediately radioed the patrol car and requested that it stop the green Pontiac Firebird.
 {¶ 6} The patrol car that Officer Mynhier radioed was being driven by Officer Phil Salm. Just as the green Pontiac Firebird was coming at him, Officer Salm heard Officer Mynhier's request to "Stop that green vehicle." Immediately after hearing the request, Officer Salm's patrol car was almost "T-boned" by the green Pontiac Firebird. At that moment, Officer Salm made eye contact with the driver and passenger in the green Pontiac Firebird. Officer Salm recognized the driver as appellant. Officer Salm did not recognize appellant's passenger, but later learned that his name was Terry Fuller.
 {¶ 7} Appellant and Fuller drove off in the green Pontiac Firebird down Lincoln Street, and Officer Salm made a U-turn and followed them. Officer Salm pulled up behind appellant's vehicle, which had come to a stop. The officer got out of his patrol car and screamed at appellant and Fuller to "let me see your hands, let me see your hands." As Officer Salm approached appellant's vehicle to initiate contact with appellant and Fuller, appellant drove off.
 {¶ 8} Officer Salm again chased after appellant's green Pontiac Firebird, which almost crashed into an SUV at one point during the chase. Eventually, the green Pontiac Firebird came to a stop. Appellant and Fuller exited the vehicle and ran off in different directions. Officer Salm decided to chase after appellant since he was "the main person operating that vehicle." Officer Salm chased appellant on foot for a considerable distance, and eventually found him lying on a porch. As Officer Salm was handcuffing appellant and placing him under arrest, appellant yelled, "Snooter was shooting at us first. Snooter was shooting at us first."
 {¶ 9} Detective Mark Specht arrived at the crime scene to help find the persons who had run from the green Pontiac Firebird. Upon arrival, he learned that his fellow officers had detained the vehicle's driver (appellant). He then received a report that someone had found a firearm on 11th Avenue. When Detective Specht went there to investigate, he found a .45 caliber handgun lying in the grassy area between the sidewalk and the curb, at 827 11th Avenue.
 {¶ 10} Detective David Shortt also responded to the crime scene. His search of appellant's green Pontiac Firebird uncovered a .45 caliber shell casing lying on the vehicle's passenger-side floorboard. Detective Shortt then proceeded to 10th Avenue where he found another .45 caliber shell casing lying on the north center portion of 10th Avenue. Subsequent testing of the .45 caliber shell casing found on the floorboard of the green Pontiac Firebird revealed that the casing matched the .45 caliber handgun found by Detective Specht. Detective Shortt also uncovered a number of .380 casings on or near the porch at 814 10th Avenue. Based upon all of the evidence he uncovered at the crime scene, Detective Shortt concluded that two weapons had been involved in the incident: (1) a .380 caliber weapon that was fired from the porch area of 814 10th Avenue, and (2) a .45 caliber weapon that was fired "from the street area * * * toward the porch."
 {¶ 11} Appellant was taken to the Middletown Police Department where he was read his Miranda rights. He was then interviewed by Detective Specht. Appellant told Detective Specht that he was driving around the area and saw Terry Fuller walking on 10th Avenue. Appellant said that Fuller asked him for a ride, and that he had agreed to give him one. Appellant stated that when Fuller opened his car door, Robert Ramos started shooting at them. Appellant said that Fuller then got into appellant's vehicle, and the two of them left the area.
 {¶ 12} Appellant told Detective Specht that he was unaware that Fuller had a handgun until the time they first pulled over momentarily, after being stopped by Officer Salm, but then took off again when Officer Salm got out of his patrol car to initiate contact. Appellant acknowledged that at that point, he did see a handgun in Fuller's lap. Appellant also told Detective Specht that he did not stop when ordered to do so by Officer Salm because "he feared for his safety" with that officer.
 {¶ 13} On May 25, 2005, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree ("Count One"), and one count of complicity to felonious assault in violation of R.C. 2923.03(A)(2) and2903.11(A)(2), a felony of the second degree ("Count Two"). Both counts were accompanied by a firearm specification pursuant to R.C. 2941.145 (offender displayed, brandished, indicated possession of or used firearm). Count Two was also accompanied by an additional firearm specification pursuant to R.C. 2941.146
(offender discharged firearm from motor vehicle).
 {¶ 14} Appellant's initial trial on these charges ended in a hung jury. On September 19-20, 2005, appellant was again tried on the charge set forth in Count Two and the two accompanying firearm specifications. At appellant's second trial, appellee presented the testimony of Officers Mynhier and Salm and Detectives Specht and Shortt, who testified to the facts related above. Detective Specht also testified that tests performed on appellant's hands shortly after his arrest showed that he had not fired a gun.
 {¶ 15} The jury convicted appellant as charged, and the trial court sentenced him to a three-year prison term for his conviction on the complicity to felonious assault charge; a mandatory three-year prison term for his conviction on the firearm specification pursuant to 2941.145; and a mandatory five-year prison term for his conviction on the firearm specification pursuant to R.C. 2941.146. The trial court ordered appellant to serve each of the prison terms consecutively.
 {¶ 16} Appellant now appeals his conviction and sentence, raising two assignments of error. We shall address appellant's second assignment of error first in order to facilitate our analysis.
 {¶ 17} Assignment of Error No. 2:
 {¶ 18} "THE COURT COMMITTED ERROR WHEN IT PERMITTED HEARSAY TESTIMONY OVER OBJECTION AS TO THE DESCRIPTION OF THE VEHICLE ALLEGED TO HAVE BEEN INVOLVED IN A SHOOTING INCIDENT."
 {¶ 19} Appellant argues that the trial court erred by allowing appellee to present inadmissible hearsay statements through the testimony of Officer Mynhier. We disagree with this argument.
 {¶ 20} During appellee's presentation of its case-in-chief, the prosecutor questioned Officer Mynhier as follows:
 {¶ 21} "Q. * * * Your partner, Officer Sensel, where did he go once you parked your vehicle?
 {¶ 22} "A. * * * As we were exiting [our patrol car], there were several older gentlemen near a vehicle on the north side of the street, and they see us start to chase Robert [Ramos, a.k.a. "Snooter"], and they tell us that —
 {¶ 23} "[Defense Counsel]: Objection.
 {¶ 24} "THE COURT: Sustained.
 {¶ 25} "Q. Well, those men that you saw there, what kind of state were they in calm, cool and collected and [sic, or] agitated, excited?
 {¶ 26} "A. They were excited. They were just yelling.
 {¶ 27} "Q. Were they offering this information voluntarily to you or were you asking them questions?
 {¶ 28} "A. No, as we were getting out of the car to chase Robert, they are yelling, dude, dude, there is a shooting that just happened, and they tell us that it's the green Firebird.
 {¶ 29} "[Defense Counsel]: Objection.
 {¶ 30} "THE COURT: I'm going to overrule the objection. I think [the prosecutor] has laid a foundation for excited utterance.
 {¶ 31} "Q. What did they stay [sic, say] then? * * *
 {¶ 32} "A. That it was the green car that was involved."
 {¶ 33} The hearsay statement at issue is Officer Mynhier's testimony that several bystanders (i.e., "several older gentlemen") told him and Officer Sensel: "dude, dude, there is a shooting that just happened," and "it's the green Firebird." The trial court admitted Officer Mynhier's testimony under the hearsay exception for excited utterances pursuant to Evid.R. 803(2).
 {¶ 34} Appellant argues that the bystanders' statements do not qualify as "excited utterances" under Evid.R. 803(2), and therefore the trial court erred by allowing Officer Mynhier to testify as to those statements. We disagree with this argument.
 {¶ 35} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Evid.R. 803 states, in pertinent part:
 {¶ 36} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 {¶ 37} "* * *
 {¶ 38} "(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 39} In State v. Taylor (1993), 66 Ohio St.3d 295, 300, the Ohio Supreme Court set forth a four-part test to determine the admissibility of an "excited utterance" or "spontaneous exclamation":
 {¶ 40} "`Such testimony as to a statement or declaration maybe admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.'" (Emphasis sic.) Taylor,66 Ohio St.3d at 300-301, quoting Potter v. Baker (1955), 162 Ohio St. 488, paragraph two of the syllabus.
 {¶ 41} A trial court has broad discretion in determining whether the necessary foundational elements have been met in deciding whether or not an out-of-court statement should be admitted as an excited utterance under Evid.R. 803(2). See Statev. Rohdes (1986), 23 Ohio St.3d 225, 228-229.
 {¶ 42} Appellant argues that it is not clear from the record whether the person or persons who allegedly uttered the statement actually saw the event. We find this argument unpersuasive.
 {¶ 43} Admittedly, the bystanders who made the excited utterance at issue in this case were never specifically identified. One commentator has made the following observation with respect to an excited utterance made by an unidentified bystander:
 {¶ 44} "It is a requirement that the declarant be affected by the exciting event [in order to have the declarant's statement admitted under the excited utterance exception to the hearsay rule], but he or she need not be involved in the event. An excited utterance by a bystander is clearly admissible. [Footnote omitted.] However, if the identity of the bystander-declarant is undisclosed, the courts have been reluctant to admit such statements, principally because of uncertainty that foundational requirements, including the impact of the event on the declarant, have been satisfied. [Footnote omitted.]" 2 McCormick on Evidence (6th Ed. 2006) 259-260, Section 272.
 {¶ 45} While acknowledging the reluctance of courts to admit excited utterances made by unidentified bystanders, McCormick nevertheless noted that "[t]he key concern should not be the literal identity of the bystander, although such identity would be helpful to permit possible impeachment, but rather the position of the declarant with regard to the events and their impact upon him or her." 2 McCormick at 260, fn. 37, Section 272.
 {¶ 46} In Miller v. Keating (C.A.3, 1985), 354 F.2d 507, the court found that it was error for a trial court to admit the out-of-court statements of an unidentified person as an excited utterance because the proponent of the evidence failed to show that the unidentified person had personal knowledge of the event from which the alleged excited utterance arose (i.e., an automobile accident), or that the unidentified person was actually startled or excited by the event. Id. at 510-512.
 {¶ 47} However, the Miller court noted that "[d]irect proof of [the declarant's] perception [of the startling or exciting event], or proof that forecloses all speculation is not required[,]" Id. at 511, and acknowledged that "[a] statement such as, `I saw that blue truck run down the lady on the corner,' might stand alone to show perception if the trial judge finds, from the particular circumstances, that he is satisfied by a preponderance that the declarant spoke from personal perception." Id.
 {¶ 48} In State v. Rawlings (Iowa 1987), 402 N.W.2d 406, the court held that an unidentified bystander's statement was admissible since the bystander's personal knowledge of the event giving rise to the statement could be inferred from the statement itself. Id. at 408-410.
 {¶ 49} In State v. Moorman (1982), 7 Ohio App.3d 251, the Hamilton County Court of Appeals held that circumstantial evidence could be used to prove that a declarant had personally observed the matters asserted in his statement or declaration. See id. at 252-253. Specifically, the Moorman court found that the fact that the declarant personally observed the startling event in question, i.e., a robbery, could be reasonably inferred from the declarant's telling the victim of the robbery that he would summon a police officer, and that at the time he told this to the victim, the declarant was in the immediate vicinity of the crime. Moorman, 7 Ohio App.3d at 252-253.
 {¶ 50} In this case, while Officer Mynhier did not literally identify the bystanders (i.e., "the several, older gentlemen") who told him that the green Pontiac Firebird was involved in the shooting, his testimony showed that the bystanders were standing near a vehicle on the north side of 10th Avenue at the time the shooting occurred. This testimony demonstrated that the unidentified bystanders had a clear vantage point of the gun battle that occurred between the occupants of the green Pontiac Firebird, i.e., appellant and Fuller, and Robert Ramos, a.k.a., "Snooter."
 {¶ 51} Furthermore, Officer Mynhier testified that the bystanders "were excited" and "just yelling" when they told him that a shooting had just happened and that the green Pontiac Firebird was involved. Thus, the evidence showed that the unidentified bystanders' positioning provided them with a clear opportunity to witness the shooting, and Officer Mynhier's testimony showed that the witnesses were "excited" and "yelling" at the time they made their statements. These factors support the trial court's decision to admit the bystander's statements as excited utterances. See 2 McCormick at 260, fn. 37, Section 272;Miller, 354 F.2d at 511; and Moorman,7 Ohio App.3d at 252-253.
 {¶ 52} In light of the foregoing, we conclude that appellee set forth a sufficient evidentiary foundation to establish that (1) the shooting constituted a startling event sufficient to produce a nervous excitement in the bystanders that stilled their reflective faculties; (2) the evidence presented permitted the trial court to infer that the bystanders made the statements before there had been time for the nervous excitement to lose a domination over their reflective faculties; (3) the bystanders' statements related to the startling event; and (4) there was sufficient evidence presented to allow the trial court to infer that the bystanders had an opportunity to observe personally the matters asserted in their statements. See Taylor,66 Ohio St.3d at 300-301. Consequently, the trial court did not abuse its discretion in admitting Officer Mynhier's testimony regarding what the unidentified bystanders told him about the shooting and the green Pontiac Firebird.
 {¶ 53} Appellant also argues that Officer Mynhier's testimony that several bystanders told him, "dude, dude, there is a shooting that just happened, and they tell us that it's the green Firebird[,]" constitutes inadmissible "hearsay within hearsay." We disagree with this argument.
 {¶ 54} When Officer Mynhier's testimony is read in context, it is apparent that what he was actually saying was that the bystanders had yelled to him: "[d]ude, dude, there is a shooting that just happened" and "it's the green Firebird." Despite appellant's assertions to the contrary, Officer Mynhier's testimony cannot be reasonably interpreted as saying that the bystanders told Officers Mynhier that a shooting had just occurred and that the bystanders, themselves, had been told by others that a green Firebird was involved in the shooting. Consequently, there is no "hearsay within hearsay" problem with Officer Mynhier's testimony.
 {¶ 55} Appellant also argues that the statements of the unidentified bystanders to which Officer Mynhier testified constitute "testimonial statements" and were therefore inadmissible pursuant to Crawford v. Washington (2004),541 U.S. 36, 124 S.Ct. 1354. We disagree with this argument.
 {¶ 56} In Crawford, the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment bars the admission of out-of-court statements that are "testimonial" in nature unless the witness is unavailable and the accused had a prior opportunity to cross-examine the witness. Crawford,541 U.S. at 68. The Crawford court declined to provide a comprehensive definition of the term "testimonial," choosing, instead, to leave that question "for another day." Id. But theCrawford court did state that "[w]hatever else the term ["testimonial"] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Crawford,541 U.S. at 68.
 {¶ 57} In Davis v. Washington (2006), ___ U.S. ___,126 S.Ct. 2266, the court expounded upon its definition of the term "testimonial" as follows:
 {¶ 58} "Without attempting to produce an exhaustive classification of all conceivable statements — or even all conceivable statements in response to police interrogation — as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis, 126 S.Ct. at 2273-2274.
 {¶ 59} In a footnote to the passage quoted above, the Davis
court stated:
 {¶ 60} "Our holding [in this case] refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations — which in some circumstances tend to generate testimonial responses. Thisis not to imply, however, that statements made in the absence ofany interrogation are necessarily nontestimonial. The Framerswere no more willing to exempt from cross-examination volunteeredtestimony or answers to open-ended questions than they were toexempt answers to detailed interrogation." (Emphasis added.)Davis, 126 S.Ct. at 2273-2274, fn. 1.
 {¶ 61} The statements made by the unidentified bystanders in this case were not the product of police interrogation, but rather were volunteered by the bystanders. Davis indicates, however, that even though volunteered statements are not the product of police interrogation, such statements may, in some instances, be considered "testimonial" for purposes of the Confrontation Clause. See id. Nevertheless, we conclude that the excited utterances of the bystanders in this case were not testimonial, and therefore the admission of those nontestimonial statements did not violate appellant's confrontation rights underCrawford.
 {¶ 62} The facts in this case objectively indicate that the bystanders made the statements with the primary purpose of enabling the police "to meet an ongoing emergency," i.e., to apprehend the persons involved in the shooting, and not with the primary purpose of establishing or proving past events that were potentially relevant to later criminal prosecution. See Davis, 126 S.Ct. at 2277. The bystanders in this case were not acting as witnesses or testifying, and what the bystanders said was not "a weaker substitute for live testimony." Id. Instead, the bystanders' statements about where the shots came from were designed to eliminate an immediate threat to their safety. Consequently, we conclude the bystanders' statements were nontestimonial rather than testimonial, and therefore appellant's right to confrontation was not implicated in this case. Id.
 {¶ 63} Appellant's second assignment of error is overruled.
 {¶ 64} Assignment of Error No. 1:
 {¶ 65} "THERE WAS INSUFFICIENT EVIDENCE AGAINST THE APPELLANT TO SUSTAIN A CONVICTION FOR COMPLICITY TO FELONIOUS ASSAULT UNDER RC [sic] 2903.11 WITH THE SPECIFICATIONS OF DISCHARGING A FIREARM WHILE COMMITTING AN OFFENCE [sic] CONTRARY TO 2941.14.6 [sic, R.C. 2941.145] OR DISCHARGING A FIREARM FROM A MOTOR VEHICLE CONTRARY TO 2941.145 [sic, 2941.146]. THE CONVICTION OF THE APPELLANT FOR SAID OFFENSES AND SPECIFICATIONS WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 66} Appellant argues that his convictions for complicity to felonious assault and for the two accompanying firearm specifications were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree with these arguments.
 {¶ 67} "In reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. McKnight,107 Ohio St.3d 101, 112, 2005-Ohio-6046, ¶ 70, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph one of the syllabus. A reviewing court must not substitute its evaluation of the witnesses' credibility for that of the jury's. See State v. Benge,75 Ohio St.3d 136, 143, 1996-Ohio-227.
 {¶ 68} Furthermore, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." Jenks,61 Ohio St.3d 259, paragraph one of the syllabus. Thus, it has long been held that "`circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'"McKnight, 107 Ohio St.3d at 113, ¶ 75.
 {¶ 69} Appellant was convicted of complicity to felonious assault in violation of R.C. 2923.03(A)(2) and 2903.11(A)(2). R.C. 2923.03, which defines the offense of complicity, states in pertinent part:
 {¶ 70} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 71} "* * *
 {¶ 72} "(2) Aid or abet[1] another in committing the offense[.]"
 {¶ 73} "* * *
 {¶ 74} "(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.
 {¶ 75} "* * *
 {¶ 76} "(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender."
 {¶ 77} R.C. 2903.11, which defines the offense of felonious assault, states in pertinent part:
 {¶ 78} "(A) No person shall knowingly[2] * * *:
 {¶ 79} "* * *
 {¶ 80} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *."
 {¶ 81} A review of the evidence shows that appellee presented sufficient evidence to convict appellant of complicity to felonious assault. The evidence shows that the passenger in appellant's car, Terry Fuller, fired shots at Robert Ramos a.k.a. "Snooter." When appellant was apprehended by Officer Salm, appellant blurted out, "Snooter shot at us first." This statement constitutes an implicit admission by appellant that he and Fuller fired a shot or shots at Snooter.
 {¶ 82} The evidence demonstrated that it was Fuller, not appellant, who actually fired the weapon. But there was evidence to show that appellant "aided and abetted" Fuller in firing the shots at Snooter. Namely, the evidence showed that appellant and Fuller were associates. There was evidence presented that allowed the jury to infer that on the day in question, appellant picked up Fuller and drove him to the place where Fuller fired shots at Snooter. The evidence also showed that appellant acted as the "get-away" driver for Fuller after Fuller fired shots at Snooter, and that appellant helped Fuller evade capture by the police, at least for a short time, after the police had ordered appellant to stop.
 {¶ 83} There was also evidence to show that appellant was aware that Fuller had a handgun on his person at the time of the shooting. Although appellant told the police that he was not aware that Fuller had a gun until after he and Fuller had decided to try to evade capture by Officer Salm, a jury is free to believe all, part, or none of the testimony of any witness who comes before it. State v. Nichols (1993), 85 Ohio App.3d 65,76. In this case, the jury was entitled to believe appellant's statement that he was aware that Fuller had a gun, while at the same time, disbelieve appellant's assertion that he was not aware that Fuller had a gun until he and Fuller tried to evade capture by the police.
 {¶ 84} One of the most important pieces of evidence against appellant was his admission that "Snooter shot at us first." As we have stated, that admission strongly implies that Fuller did, in fact, shoot at Snooter. The jury in this case was free to believe that implied admission from appellant, while at the same time, disbelieve the additional implication of that admission, i.e., that in firing shots at Snooter, appellant and Fuller were merely retaliating for Snooter's actions or acting in self-defense. See Nichols, 85 Ohio App.3d at 76.
 {¶ 85} Appellee also presented sufficient evidence to convict appellant on both of the firearm specifications with which he was charged pursuant to R.C. 2941.145 and 2941.146. R.C. 2941.145(A) provides for imposition of a three-year mandatory prison term upon an offender who "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."
 {¶ 86} R.C. 2941.146(A) provides for imposition of a mandatory five-year prison term upon an offender "for committing a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another and that was committed by discharging a firearm from a motor vehicle other than a manufactured home[.]"
 {¶ 87} Appellee presented sufficient evidence to show that appellant's accomplice, Fuller, used a firearm to facilitate his offense of felonious assault against Snooter, see R.C. 2941.145, and that Fuller discharged the firearm from appellant's green Pontiac Firebird, which qualifies as "a motor vehicle other than a manufactured home." R.C. 2941.146. In particular, the evidence showed that there was a .45 caliber shell casing found on the floorboard of appellant's vehicle, thereby indicating that the .45 caliber handgun that was found by the police had been fired from appellant's vehicle.
 {¶ 88} Furthermore, because there was evidence to show that appellant aided and abetted Fuller in committing the crime of felonious assault against Snooter, appellant is as liable as if he were the principal offender, pursuant to R.C. 2923.03(F). SeeState v. Butler, Jefferson App. No. 01-JE-34, 2003-Ohio-3468, ¶ 65 (as an accomplice to the offense, defendant-appellant is liable as if he were the principal offender).
 {¶ 89} In support of his manifest-weight-of-the-evidence challenge, appellant cites Officer Mynhier's testimony that he heard at least six shots from a "higher-pitched smaller caliber weapon followed by one or two [shots from a] lower-pitched larger caliber weapon." Appellant asserts that the evidence established that the six shots fired from the higher-pitched, smaller caliber weapon, were fired by Snooter, while the one or two shots fired from the lower-pitched, larger caliber weapon were fired from the .45 caliber weapon that was found by the police, "whoever may have fired it." As we have stated, the evidence indicates that it was Fuller who fired the .45 caliber handgun.
 {¶ 90} By pointing to this particular evidence, appellant appears to be implying that the manifest weight of the evidence in this case established that Snooter was the aggressor in this incident, and that appellant and Fuller were merely acting in self-defense when they fired shots at him. Appellant argues that the jury "completely ignored" these "uncontroverted" facts when it rendered its verdict, and, therefore, the jury's verdict is against the manifest weight of the evidence. We find this argument unpersuasive.
 {¶ 91} In reviewing a claim that a conviction is against the manifest weight of the evidence, an appellate court is obligated to review the entire record, weighing the evidence and all reasonable inferences that can be drawn from it, and considering the credibility of the witnesses in determining whether the jury clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See Statev. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quotingMartin, 20 Ohio App.3d at 175.
 {¶ 92} While an appellate court must consider the credibility of the witnesses and the weight to be given the evidence presented in evaluating a challenge to the manifest weight of the evidence, the court must nevertheless be mindful that these considerations are primarily matters for the trier of fact, since the trier of fact is in the best position to observe the testimony of the witnesses and to judge their credibility. SeeState v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; and State v. Nichols (1993), 85 Ohio App.3d 65, 76.
 {¶ 93} To establish self-defense, a defendant must prove, by a preponderance of the evidence, that the defendant: (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger. See State v. Jackson
(1986), 22 Ohio St.3d 281, 283-284
 {¶ 94} The issue of whether or not appellant and Fuller were acting in self-defense was placed before the jury, and the jury rejected it. It is not difficult to see why. The evidence showed that when Officer Salm tried to stop appellant after the shooting had occurred, appellant did not stop as ordered and seek the assistance of law enforcement. Instead, he and Fuller fled from Officer Salm. Appellant's and Fuller's flight from law enforcement under these circumstances permitted the jury reasonably to infer that appellant and Fuller were at fault "in creating the situation giving rise to the affray[,]" seeJackson, and therefore reject appellant's claim that he and Fuller were merely acting in self-defense when they fired shots at Snooter.
 {¶ 95} In light of the foregoing, the jury's verdict finding appellant guilty as charged was not contrary to the manifest weight of the evidence.
 {¶ 96} Appellant's first assignment of error is overruled.
 {¶ 97} The trial court's judgment is affirmed.
Powell, P.J., and Young, J., concur.
[1] "Aid and abet" means "to assist or facilitate the commission of a crime, or to promote its accomplishment." Black's Law Dictionary (8th Ed. 2004) 76.
[2] "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).